## BALZAC v. PEOPLE OF PORTO RICO.

### ERROR TO THE SUPREME COURT OF PORTO RICO.

Nos. 178, 179. Argued March 20, 1922.—Decided April 10, 1922.

1. The Act of January 28, 1915, c. 22, 38 Stat. 803, amending § 246 of the Judicial Code, and providing that writs of error from this court may be prosecuted to the supreme courts of Porto Rico and Hawaii in the same classes of cases as to the courts of last resort of the States under Jud. Code, § 237, meant to assimilate the jurisdiction over those territorial courts to that over the state courts and is to be construed as embracing subsequent changes in § 237 not obviously inapplicable, such as the amendments made by the Act of September 6, 1916, c. 448, 39 Stat. 726. P. 300.

2. In prosecutions for criminal libel in a district court of Porto Rico, defendant demanded a jury under the Sixth Amendment, which was denied him upon a construction of local statutes, applicable to this and other misdemeanors. Held, that the demand drew in question the validity of the statutes, within the meaning of Jud. Code, § 237, as amended in 1916, and that judgments of the Supreme Court of Porto Rico affirming the convictions were reviewable here by writ of error. P. 302.

3. To present the constitutionality of a statute, it is not essential that an assignment of error should mention the statute in question, if the record definitely shows that its constitutionality was questioned and the assignment is clearly directed to that controversy. P. 303.

4. The provisions of the Constitution guaranteeing jury trial in all criminal prosecutions do not apply to a territory belonging to the

United States which has not been incorporated into the Union; and Porto Rico was not so incorporated by the Act of April 12, 1900, c. 191, 31 Stat. 77, which gave it a temporary government. P. 304. *Dorr* v. *United States*, 195 U. S. 138.

5. The Organic Act for Porto Rico of March 2, 1917, c. 145, 39 Stat. 951, known as the Jones Act, did not have the effect of incorporating Porto Rico into the United States. P. 305.

6. Since the Spanish War, an intention of Congress to incorporate new territory into the Union is not to be admitted without express declaration or an implication so strong as to exclude any other view. P. 306.

7. The provisions of § 5 of the Organic Act, *supra*, for extending federal citizenship to citizens and certain residents of Porto Rico, did not extend the jury system there. P. 307.

8. Neither can incorporation into the United States be implied from the organization of the United States District Court in Porto Rico, allowance of review of cases from its Supreme Court involving the Constitution, admission of Porto Ricans to the Military and Naval Academies, sale of United States stamps in the Island, or extension to it of federal revenue, navigation, banking, bankruptcy, employers' liability, safety appliance, extradition and census laws. P. 311.

9. Published reflexions on the Governor of Porto Rico, *held* libelous and not legitimate comment protected by the guaranty of free speech and free press in the First Amendment of the Constitution. P. 314.

28 P. R. 139, 141 affirmed.

REVIEW of two judgments of the Supreme Court of Porto Rico which affirmed judgments of the District Court for Arecibo imposing sentences to imprisonment based on convictions of criminal libel.[1]

*Mr. Jackson H. Ralston*, with whom *Mr. Stanley D. Willis* and *Mr. Wm. T. Rankin* were on the brief, for Balzac.

*Mr. Grant T. Trent*, with whom *Mr. Arthur W. Beer* was on the brief, for Porto Rico.

---

[1] The records were brought up in the form of appeals but are treated as here on writ of error.

MR. CHIEF JUSTICE TAFT delivered the opinion of the court.

These are two prosecutions for criminal libel brought against the same defendant, Jesus M. Balzac, on informations filed in the District Court for Arecibo, Porto Rico, by the District Attorney for that District. Balzac was the editor of a daily paper published in Arecibo, known as "El Baluarte", and the articles upon which the charges of libel were based were published on April 16 and April 23, 1918, respectively. In each case the defendant demanded a jury. The code of criminal procedure of Porto Rico grants a jury trial in cases of felony but not in misdemeanors. The defendant, nevertheless, contended that he was entitled to a jury in such a case, under the Sixth Amendment to the Constitution, and that the language of the alleged libels was only fair comment and their publication was protected by the First Amendment. His contentions were overruled, he was tried by the court and was convicted in both cases and sentenced to five months' imprisonment in the district jail in the first, and to four months in the second, and to the payment of the costs in each. The defendant appealed to the Supreme Court of Porto Rico. That court affirmed both judgments. *People v. Balzac*, 28 P. R. 139, Second Case, 28 P. R. 141.

The first question in these cases is one of jurisdiction of this court. By § 244 of the Judicial Code, approved March 3, 1911, it was provided that writs of error and appeals from the final judgments and decrees of the Supreme Court of Porto Rico might be prosecuted to this court in any case in which was drawn in question the validity of a treaty or statute of, or authority exercised under, the United States, or wherein the Constitution of the United States, or a treaty thereof, or an act of Congress was brought in question and the right claimed thereunder was denied, and this without regard to the

amount involved. By the Act of January 28, 1915, c. 22, 38 Stat. 803, § 244 of the Judicial Code was repealed, but § 246 was amended and made to apply to the appellate jurisdiction of this court in respect to the decisions of the Supreme Court not only of Hawaii, as before, but also Porto Rico, and it was provided that writs of error to those courts from this court could be prosecuted in the same class of cases as those in which this court was authorized under § 237 of the Judicial Code to review decisions of state courts of last resort. Section 237 at that time allowed a writ of error to final decisions in state courts of last resort where was drawn in question the validity of a treaty, or a statute of, or an authority exercised under, the United States, and the decision was against its validity; or where was drawn in question the validity of a statute of, or an authority exercised under any State, on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, and the decision was in favor of its validity; or where any title, right, privilege or immunity was claimed under the Constitution, or any treaty or statute of, or commission held or authority exercised under, the United States, and the decision was against the title, right, privilege or immunity especially set up or claimed by either party under such Constitution, treaty, statute, commission or authority. By Act of January 28, 1915, 38 Stat. 803, 804, amending § 246, this court was given power by certiorari to bring up for review all final judgments or decrees in civil or criminal cases in the supreme courts of Porto Rico and Hawaii, other than those reviewable here by writ of error because in the class similar to that described in § 237 of the Judicial Code. By Act of September 6, 1916, c. 448, 39 Stat. 726, the jurisdiction of this court to review by writ of error, under § 237, final judgments and decrees of state courts of last resort was cut down by omitting cases (other than those involving the validity of

a treaty, statute or authority exercised under the United States or any State) wherein a title, right, privilege, or immunity, was claimed under the Constitution, or any treaty or statute of, or commission held, or authority exercised under, the United States, and the decision was against such title, right, privilege or immunity, and such cases, it was provided, could only be examined on review in this court by certiorari.

The question now presented is whether the amendment to § 237 of the Judicial Code by the Act of 1916 applies to, and affects, the appellate jurisdiction of this court in reviewing decisions of the Supreme Court of Porto Rico. We think it does. We think that the manifest purpose of the Act of 1915, amending § 246 of the Code, in its reference to § 237 of the Judicial Code, was to assimilate the appellate jurisdiction of this court over the supreme courts of Porto Rico and Hawaii to that over state courts of last resort, and that the reference in amended § 246 to § 237 may be fairly construed to embrace subsequent changes in § 237 that are not obviously inapplicable.

This brings us to the question whether there was drawn in question in these cases the validity of a statute of Porto Rico under the Constitution of the United States. The Penal Code of Porto Rico divides crimes into felonies and misdemeanors. (Rev. Stats. and Codes of Porto Rico, 1911, Penal Code, § 13.) A felony is described as a crime punishable by death or by imprisonment in the penitentiary. Every other crime is declared to be a misdemeanor. Penal Code, § 14. Section 178 of the Porto Rican Code of Criminal Procedure provided that issues of fact in cases of felony should be tried by a jury when the defendant so elected, but gave no such right in the case of misdemeanors. This was construed by the Supreme Court to deny such right. *People* v. *Bird*, 5 P. R. 387.

By § 244 (5676) of the Penal Code (as amended by Act of March 9, 1911, p. 71), the publication of a libel is made

punishable by a fine not exceeding $5,000, or imprisonment in jail for a term not exceeding two years, or both such fine and imprisonment, and also the costs of the action in the discretion of the court. It is, therefore, plain that libel under the Porto Rican law is a misdemeanor, and a jury trial was not required therein. By the Act of July 22, 1919 (Laws of Porto Rico, 1919, No. 84, p. 684), a jury trial is now given in misdemeanors, but that did not come into force until after these libels were published and these trials had.

When the Penal Code and the Code of Criminal Procedure were first passed in 1901, they both contained the provision that in all cases of libel the jury should determine the law and the fact. It was held, however, by the Supreme Court of Porto Rico in *People* v. *Bird*, 5 P. R. 387, 405, that this did not give a jury trial but only made provision that, if and when a right of jury trial was given in such cases, the jury should have the power to determine the law and the fact. Thereafter the Act of March 10, 1904 (Laws of Porto Rico, 1904, p. 130), expressly repealed all reference to trials for libel in the jury act.

The effect of the Penal Code of Procedure, as construed by the Supreme Court of Porto Rico, and of the Act of March 10th repealing the jury act as to libel cases, was a statutory denial of the right of jury trial in such cases. A demand for a jury trial in this case, therefore, drew in question the validity of the statutes upon which the court relied in denying the demand. This necessarily leads to the conclusion that these cases are in the same class as those which come to this court by writ of error under § 237, as amended by the Act of 1916, and that jurisdiction by writ of error exists.

Was the issue properly saved in the record by the defendant? We think it was. The demand for a jury trial, the statute to the contrary notwithstanding, was made at the trial. It was renewed in the assignments of error in

the Porto Rican Supreme Court and here. Those assignments did not mention the statutes whose validity was involved, but merely averred that the defendant had been denied his right as an American citizen under the Sixth Amendment to the Constitution. While this is informal, we think that it is sufficient when the record discloses the real nature of the controversy and the specification of the assignment leaves no doubt that it is directed to that controversy.

We have now to inquire whether that part of the Sixth Amendment to the Constitution, which requires that, in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, applies to Porto Rico. Another provision on the subject is in Article III of the Constitution providing that the trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the State where the said crimes shall have been committed; but, when not committed within any State, the trial shall be at such place or places as the Congress may by law have directed. The Seventh Amendment of the Constitution provides that in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved. It is well settled that these provisions for jury trial in criminal and civil cases apply to the Territories of the United States. *Webster* v. *Reid,* 11 How. 437, 460; *Reynolds* v. *United States,* 98 U. S. 145, 167; *Callan* v. *Wilson,* 127 U. S. 540, 556; *American Publishing Co.* v. *Fisher,* 166 U. S. 464; *Thompson* v. *Utah,* 170 U. S. 343, 347; *Capital Traction Co.* v. *Hof,* 174 U. S. 1; *Black* v. *Jackson,* 177 U. S. 349; *Rassmussen* v. *United States,* 197 U. S. 516, 528; *Gurvich* v. *United States,* 198 U. S. 581. But it is just as clearly settled that they do not apply to territory belonging to the

United States which has not been incorporated into the Union. *Hawaii* v. *Mankichi,* 190 U. S. 197; *Dorr* v. *United States,* 195 U. S. 138, 145. It was further settled in *Downes* v. *Bidwell,* 182 U. S. 244, and confirmed by *Dorr* v. *United States,* 195 U. S. 138, that neither the Philippines nor Porto Rico was territory which had been incorporated in the Union or become a part of the United States, as distinguished from merely belonging to it; and that the acts giving temporary governments to the Philippines, 32 Stat. 691, and to Porto Rico, 31 Stat. 77, had no such effect. The *Insular Cases* revealed much diversity of opinion in this court as to the constitutional status of the territory acquired by the Treaty of Paris ending the Spanish War, but the *Dorr Case* shows that the opinion of Mr. Justice White of the majority, in *Downes* v. *Bidwell,* has become the settled law of the court. The conclusion of this court in the *Dorr Case,* p. 149, was as follows:

" We conclude that the power to govern territory, implied in the right to acquire it, and given to Congress in the Constitution in Article IV, § 3, to whatever other limitations it may be subject, the extent of which must be decided as questions arise, does not require that body to enact for ceded territory, not made a part of the United States by Congressional action, a system of laws which shall include the right of trial by jury, and that the Constitution does not, without legislation and of its own force, carry such right to territory so situated."

The question before us, therefore, is: Has Congress, since the Foraker Act of April 12, 1900, c. 191, 31 Stat. 77, enacted legislation incorporating Porto Rico into the Union? Counsel for the plaintiff in error give, in their brief, an extended list of acts, to which we shall refer later, which they urge as indicating a purpose to make the Island a part of the United States; but they chiefly rely on the Organic Act of Porto Rico of March 2, 1917, c. 145, 39 Stat. 951, known as the Jones Act.

The act is entitled " An Act To provide a civil govern-
ment for Porto Rico, and for other purposes." It does not
indicate by its title that it has a purpose to incorporate
the Island into the Union. It does not contain any
clause which declares such purpose or effect. While this
is not conclusive, it strongly tends to show that Congress
did not have such an intention. Few questions have been
the subject of such discussion and dispute in our country
as the status of our territory acquired from Spain in 1899.
The division between the political parties in respect to
it, the diversity of the views of the members of this
court in regard to its constitutional aspects, and the con-
stant recurrence of the subject in the Houses of Congress,
fixed the attention of all on the future relation of this
acquired territory to the United States. Had Congress
intended to take the important step of changing the treaty
status of Porto Rico by incorporating it into the Union,
it is reasonable to suppose that it would have done so by
the plain declaration, and would not have left it to mere
inference. Before the question became acute at the close
of the Spanish War, the distinction between acquisition
and incorporation was not regarded as important, or at
least it was not fully understood and had not aroused great
controversy. Before that, the purpose of Congress might
well be a matter of mere inference from various legisla-
tive acts; but in these latter days, incorporation is not
to be assumed without express declaration, or an im-
plication so strong as to exclude any other view.

Again, the second section of the act is called a " Bill of
Rights ", and included therein is substantially every one
of the guaranties of the Federal Constitution, except those
relating to indictment by a grand jury in the case of
infamous crimes and the right of trial by jury in civil
and criminal cases. If it was intended to incorporate
Porto Rico into the Union by this act, which would *ex
proprio vigore* make applicable the whole Bill of Rights

of the Constitution to the Island, why was it thought necessary to create for it a Bill of Rights and carefully exclude trial by jury? In the very forefront of the act is this substitute for incorporation and application of the Bill of Rights of the Constitution. This seems to us a conclusive argument against the contention of counsel for the plaintiff in error.

The section of the Jones Act which counsel press on us is § 5. This in effect declares that all persons who under the Foraker Act were made citizens of Porto Rico and certain other residents shall become citizens of the United States, unless they prefer not to become such, in which case they are to declare such preference within six months, and thereafter they lose certain political rights under the new government. In the same section the United States District Court is given power separately to naturalize individuals of some other classes of residents. We set out the section in full in the margin.[1] Unaffected by the con-

---

[1] Sec. 5. That all citizens of Porto Rico, as defined by section seven of the Act of April twelfth, nineteen hundred, " temporarily to provide revenues and a civil government for Porto Rico, and for other purposes ", and all natives of Porto Rico who were temporarily absent from that island on April eleventh, eighteen hundred and ninety-nine, and have since returned and are permanently residing in that island, and are not citizens of any foreign country, are hereby declared, and shall be deemed and held to be, citizens of the United States: *Provided,* That any person hereinbefore described may retain his present political status by making a declaration, under oath, of his decision to do so within six months of the taking effect of this Act before the district court in the district in which he resides, the declaration to be in form as follows:

" I, . . . . . . . . . ., being duly sworn, hereby declare my intention not to become a citizen of the United States as provided in the Act of Congress conferring United States citizenship upon citizens of Porto Rico and certain natives permanently residing in said island."

In the case of any such person who may be absent from the island during said six months the term of this proviso may be availed of by transmitting a declaration, under oath, in the form herein provided

siderations already suggested, perhaps the declaration of § 5 would furnish ground for an inference such as counsel for plaintiff in error contend, but under the circumstances we find it entirely consistent with non-incorporation. When Porto Ricans passed from under the government of Spain, they lost the protection of that government as subjects of the King of Spain, a title by which they had been known for centuries. They had a right to expect, in passing under the dominion of the United States, a status entitling them to the protection of their new sovereign. In theory and in law, they had it as citizens of Porto Rico, but it was an anomalous status, or seemed to be so in view of the fact that those who owed and rendered allegiance to the other great world powers were given the same designation and status as those living in their respective home countries so far as protection against foreign injustice went. It became a yearning of the Porto Ricans to be American citizens, therefore, and this act gave them the boon. What additional rights did it give them? It enabled them to move into the continental United States and becoming residents of any State there to enjoy every right of any other citizen of the United States, civil, social and political. A citizen of the Philippines must be naturalized before he can settle and vote in this country. Act of June 29, 1906, c. 3592, § 30, 34 Stat. 606. Not so the Porto Rican under the Organic Act of 1917.

---

within six months of the taking effect of this Act to the executive secretary of Porto Rico: *And provided further,* That any person who is born in Porto Rico of an alien parent and is permanently residing in that island may, if of full age, within six months of the taking effect of this Act, or if a minor, upon reaching his majority or within one year thereafter, make a sworn declaration of allegiance to the United States before the United States District Court for Porto Rico, setting forth therein all the facts connected with his or her birth and residence in Porto Rico and accompanying due proof thereof, and from and after the making of such declaration shall be considered to be a citizen of the United States.

In Porto Rico, however, the Porto Rican can not insist upon the right of trial by jury, except as his own representatives in his legislature shall confer it on him. The citizen of the United States living in Porto Rico can not there enjoy a right of trial by jury under the Federal Constitution, any more than the Porto Rican. It is locality that is determinative of the application of the Constitution, in such matters as judicial procedure, and not the status of the people who live in it.

It is true that, in the absence of other and countervailing evidence, a law of Congress or a provision in a treaty acquiring territory, declaring an intention to confer political and civil rights on the inhabitants of the new lands as American citizens, may be properly interpreted to mean an incorporation of it into the Union, as in the case of Louisiana and Alaska. This was one of the chief grounds upon which this court placed its conclusion that Alaska had been incorporated in the Union, in *Rassmussen* v. *United States,* 197 U. S. 516. But Alaska was a very different case from that of Porto Rico. It was an enormous territory, very sparsely settled and offering opportunity for immigration and settlement by American citizens. It was on the American Continent and within easy reach of the then United States. It involved none of the difficulties which incorporation of the Philippines and Porto Rico presents, and one of them is in the very matter of trial by jury. This court refers to the difficulties in *Dorr* v. *United States,* 195 U. S. 138, 148:

" If the right to trial by jury were a fundamental right which goes wherever the jurisdiction of the United States extends, or if Congress, in framing laws for outlying territory belonging to the United States was obliged to establish that system by affirmative legislation, it would follow that, no matter what the needs or capacities of the people, trial by jury, and in no other way, must be forthwith established, although the result may be to work injustice

and provoke disturbance rather than to aid the orderly
administration of justice. . . . . Again, if the United
States shall acquire by treaty the cession of territory hav-
ing an established system of jurisprudence, where jury
trials are unknown, but a method of fair and orderly trial
prevails under an acceptable and long-established code,
the preference of the people must be disregarded, their
established customs ignored and they themselves coerced
to accept, in advance of incorporation into the United
States, a system of trial unknown to them and unsuited to
their needs. We do not think it was intended, in giving
power to Congress to make regulations for the territories,
to hamper its exercise with this condition."

The jury system needs citizens trained to the exercise
of the responsibilities of jurors. In common-law coun-
tries centuries of tradition have prepared a conception of
the impartial attitude jurors must assume. The jury sys-
tem postulates a conscious duty of participation in the
machinery of justice which it is hard for people not
brought up in fundamentally popular government at once
to acquire. One of its greatest benefits is in the security
it gives the people that they, as jurors actual or possible,
being part of the judicial system of the country can pre-
vent its arbitrary use or abuse. Congress has thought
that a people like the Filipinos or the Porto Ricans,
trained to a complete judicial system which knows no
juries, living in compact and ancient communities, with
definitely formed customs and political conceptions,
should be permitted themselves to determine how far they
wish to adopt this institution of Anglo-Saxon origin, and
when. Hence the care with which from the time when
Mr. McKinley wrote his historic letter to Mr. Root in
April of 1900, Public Laws, Philippine Commission, pp.
6–9—Act of July 1, 1902, c. 1369, 32 Stat. 691, 692, con-
cerning the character of government to be set up for the
Philippines by the Philippine Commission, until the Act

of 1917, giving a new Organic Act to Porto Rico, the
United States has been liberal in granting to the Islands
acquired by the Treaty of Paris most of the American
constitutional guaranties, but has been sedulous to avoid
forcing a jury system on a Spanish and civil-law country
until it desired it. We can not find any intention to de-
part from this policy in making Porto Ricans American
citizens, explained as this is by the desire to put them
as individuals on an exact equality with citizens from the
American homeland, to secure them more certain protec-
tion against the world, and to give them an opportunity,
should they desire, to move into the United States proper
and there without naturalization to enjoy all political and
other rights.

We need not dwell on another consideration which re-
quires us not lightly to infer, from acts thus easily ex-
plained on other grounds, an intention to incorporate in
the Union these distant ocean communities of a different
origin and language from those of our continental people.
Incorporation has always been a step, and an important
one, leading to statehood. Without, in the slightest de-
gree, intimating an opinion as to the wisdom of such a
policy, for that is not our province, it is reasonable to as-
sume that when such a step is taken it will be begun and
taken by Congress deliberately and with a clear declara-
tion of purpose, and not left a matter of mere inference
or construction.

Counsel for the plaintiff in error also rely on the organ-
ization of a United States District Court in Porto Rico;
on the allowance of review of the Porto Rican Supreme
Court in cases when the Constitution of the United States
is involved, on the statutory permission that Porto Rican
youth can attend West Point and Annapolis Academies,
on the authorized sale of United States stamps in the
Island, on the extension of revenue, navigation, immigra-

tion, national banking, bankruptcy, federal employers' liability, safety appliance, extradition, and census laws in one way or another to Porto Rico. With the background of the considerations already stated, none of these nor all of them put together furnish ground for the conclusion pressed on us.

The United States District Court is not a true United States court established under Article III of the Constitution to administer the judicial power of the United States therein conveyed. It is created by virtue of the sovereign congressional faculty, granted under Article IV, § 3, of that instrument, of making all needful rules and regulations respecting the territory belonging to the United States. The resemblance of its jurisdiction to that of true United States courts in offering an opportunity to nonresidents of resorting to a tribunal not subject to local influence, does not change its character as a mere territorial court. Nor does the legislative recognition that federal constitutional questions may arise in litigation in Porto Rico have any weight in this discussion. The Constitution of the United States is in force in Porto Rico as it is wherever and whenever the sovereign power of that government is exerted. This has not only been admitted but emphasized by this court in all its authoritative expressions upon the issues arising in the *Insular Cases,* especially in the *Downes* v. *Bidwell* and the *Dorr Cases.* The Constitution, however, contains grants of power and limitations which in the nature of things are not always and everywhere applicable, and the real issue in the *Insular Cases* was not whether the Constitution extended to the Philippines or Porto Rico when we went there, but which of its provisions were applicable by way of limitation upon the exercise of executive and legislative power in dealing with new conditions and requirements. The guaranties of certain fundamental personal rights declared in the Constitution, as for in-

stance that no person could be deprived of life, liberty or property without due process of law, had from the beginning full application in the Philippines and Porto Rico, and, as this guaranty is one of the most fruitful in causing litigation in our own country, provision was naturally made for similar controversy in Porto Rico. Indeed provision is made for the consideration of constitutional questions coming on appeal and writ of error from the Supreme Court of the Philippines, which are certainly not incorporated in the Union. Judicial Code, § 248.

On the whole, therefore, we find no features in the Organic Act of Porto Rico of 1917 from which we can infer the purpose of Congress to incorporate Porto Rico into the United States with the consequences which would follow.

This court has passed on substantially the same questions presented here in two cases, *Porto Rico* v. *Tapia,* and *Porto Rico* v. *Muratti,* 245 U. S. 639. In the former, the question was whether one who was charged with committing a felonious homicide some twelve days after the passage of the Organic Act in 1917, could be brought to trial without an indictment of a grand jury as required by the Fifth Amendment to the Constitution. The United States District Court of Porto Rico on a writ of habeas corpus held that he could not be held to answer and discharged him. In the other case, the felony charged was alleged to have been committed before the passage of the Organic Act, but prosecution was begun afterwards. In that, the Supreme Court of Porto Rico held that an indictment was rendered necessary by the Organic Act. This court reversed the District Court in the *Tapia Case* and the Supreme Court in the *Muratti Case,* necessarily holding the Organic Act had not incorporated Porto Rico into the United States. These cases were disposed of by a *per curiam.* Counsel have urged us in the cases

at the bar to deal with the questions raised more at length in exposition of the effect of the Organic Act of 1917 upon the issue, and we have done so.

A second assignment of error is based on the claim that the alleged libels here did not pass the bounds of legitimate comment on the conduct of the Governor of the Island against whom they were directed, and that their prosecution is a violation of the First Amendment to the Constitution securing free speech and a free press. A reading of the two articles removes the slightest doubt that they go far beyond the "exuberant expressions of meridional speech," to use the expression of this court in a similar case in *Gandia* v. *Pettingill*, 222 U. S. 452, 458. Indeed they are so excessive and outrageous in their character that they suggest the query whether their superlative vilification has not overleapt itself and become unconsciously humorous. But this is not a defence.

The judgments of the Supreme Court of Porto Rico are

*Affirmed.*

Mr. Justice HOLMES concurs in the result.